## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC., | § § § § § § § § | Case No. 7:26-cv-00078 |
| Plaintiff, | § § | |
| BECON, INC., LDMA LIMITED PARTNERSHIP, and BERRY GP, INC., | § § § § | |
| Nominal Plaintiffs, | § § | |
| v. | § § | JURY TRIAL DEMANDED |
| MARVIN G. BERRY; MICHAEL HUMMELL; BONNIE BERRY, individually and as Independent Executor of the Estate of Dennis Berry, CORPORATE STRATEGIES, LLC d/b/a CORPORATE STRATEGIES MERCHANT BANKERS; TIMOTHY J. CONNOLLY; WESTERN GULF EQUIPMENT, LLC; BECON, INC., LDMA LIMITED PARTNERSHIP, and BERRY GP, INC. | § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lawrence Berry, individually and as Trustee of the Allen Lawrence Berry Trust ("**Plaintiff**" or "**Lawrence Berry**"), directly and derivatively on behalf of Becon, Inc., LDMA Limited Partnership, and Berry GP, Inc. (collectively, "**Nominal Plaintiffs**") by and through his undersigned attorneys, alleges as follows:

## I.    INTRODUCTION

1.    Lawrence Berry is the victim of a years-long, multi-party scheme to steal his interests in his 70-year-old family business through fraud, self-dealing, and corruption. Through this action, he seeks to end this ongoing fraud and hold the perpetrators accountable.

2.    Along with his two brothers—Defendant Marvin G. "Marty" Berry ("**Marty Berry**") and now-deceased Dennis Berry—Lawrence Berry is a co-owner of a collection of companies founded and once owned and controlled by his father, Marvin Berry (hereinafter the "**Berry Entities**").[1] The Berry Entities operate businesses engaged in a variety of industries, including construction, fabrication, and maintenance businesses in Houston, Corpus Christi, Lubbock, Midland, and elsewhere throughout the Permian Basin and across the United States.

3.    In early 2023, Lawrence Berry asked the executives of one of these family-owned businesses about a related-party loan listed in a financial report. That question pulled a thread that ultimately unraveled a complex scheme led by his brother Marty Berry and others to strip the Berry Enterprises of its assets through multi-million-dollar self-dealing loans, hidden insider transactions, and the compromise of valuable company properties—all at Lawrence Berry's expense. Multiple parties enthusiastically supported and financially benefited from Marty Barry's scheme, including Defendant Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel and now board director ("**Hummel**"); Defendant Bonnie Berry, the widow of Dennis

---

[1] The "Berry Entities" collectively refers to Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP.

Berry and the Independent Executor of the Estate of Dennis Berry ("**Bonnie Berry**"); Defendant Connolly Corporate Strategies, LLC d/b/a Corporate Strategies Merchant Bankers ("**CSMB**") and its principal, Defendant Timothy J. Connolly ("**Connolly**"); and Western Gulf Equipment, LLC, a company controlled by Marty Berry ("**Western Gulf**," and collectively with Marty Berry, Bonnie Berry, CSMB, and Connolly, "**Defendants**").

4.      Lawrence Berry first pursued justice in Texas state courts, pursuing breach of fiduciary duty claims and others in Nueces County. But as discovery in those cases revealed the scope and scale of the Defendants' fraud, it became clear that relief under federal law was necessary to stop the ongoing fraud and provide Lawrence Berry with adequate remedies.

5.      Lawrence Berry therefore files this action asserting claims against Defendants under the Racketeer Influenced and Corrupt Organizations Act, U.S.C. §§ 1961–1968 ("**RICO**"). In the interests of judicial efficiency, he also asserts claims for common law fraud, breach of fiduciary duty, and others against Defendants and has nonsuited comparable claims pending in the state court litigation. He seeks compensatory damages, treble damages pursuant to RICO, and exemplary damages under Texas law, along with preliminary and permanent injunctive relief to stop Defendants' ongoing misconduct.

## II.      PARTIES

6.      Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. Plaintiff brings this action in his individual capacity and as Trustee of the Allen Lawrence Berry Trust (the "**Trust**").  At all relevant times, Lawrence Berry has owned shares of Berry GP, Inc. ("**Berry GP**"), Berry Operating Company LLC ("**Berry Operating**"), and Berry Contracting LP ("**Berry Contracting**") individually and through a series of holding companies, including Becon, Inc. ("**Becon**") and LDMA Limited Partnership ("**LDMA**"). Lawrence Berry is also the beneficial owner of the shares in those companies held in the Trust. Finally, at certain relevant times,

Lawrence Berry has been an Officer, Director, partner, and/or shareholder of LDMA, Becon, Berry GP, Berry Operating, and Berry Contracting.

7.     Defendant Marty Berry is an individual residing in Nueces County, Texas. Through his ownership in the Berry Entities and other companies, and in various other capacities, Marty Berry has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas.

8.     Defendant Michael "Mike" Hummell is an individual residing in Nueces County, Texas. At relevant times, he served as Vice President and General Counsel of Berry GP and later as a director. Through his service as a senior executive and member of the Board of Directors in the Berry Entities, and in various other capacities, Hummel has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas.

9.     Defendant Bonnie Berry is an individual residing in Nueces County, Texas, both individually and as Independent Executor of the Estate of Dennis W. Berry (who died on or about February 8, 2024). Through her ownership in the Berry Entities and other companies, and in various other capacities, Bonnie Berry has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas.

10.     Defendant Corporate Strategies, LLC d/b/a Corporate Strategies Merchant Bankers is a Texas limited liability company with its principal offices in Harris County, Texas. CSMB maintains regular, substantial, and continuous business activity in Austin, Texas and elsewhere in the Western District of Texas.

11.     Defendant Timothy J. Connolly is an individual residing in Harris County, Texas and is a principal and/or agent of CSMB. Through ownership in CSMB and other capacities, Connolly has maintained regular, substantial, and continuous business activity in Austin, Texas and

elsewhere in the Western District of Texas

12.    Defendant Western Gulf Equipment, LLC is a Texas limited liability company. On information and belief, it is owned and controlled by Marty Berry and is used to transact self-dealing equipment purchases and leases with the Berry Entities. Its registered agent is Michael H. Hummell at 1414 Valero Way, Corpus Christi, Texas 78409. Through its agreements with the Berry Entities and ownership of cranes, as described herein, Western Gulf has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas

13.    Nominal Plaintiff/Defendant Becon, Inc. is a Texas corporation headquartered in this state with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Charles Vanaman is its registered agent for service of process, and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409. Through its ownership interests in Berry GP and other entities, Becon has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas

14.    Nominal Plaintiff/Defendant LDMA Partnership is a Texas limited partnership with a registered address at 1414 Valero Way, Corpus Christi, Texas 78409. Through its ownership interests in Berry GP and other entities, LDMA has maintained regular, substantial, and continuous business activity within the Midland Division and elsewhere in the Western District of Texas

15.    Nominal Plaintiff/Defendant Berry GP, Inc. is its registered agent for service of process, and it can be served at 1414 Valero Way, Corpus Christi, Texas 78409. Berry GP has agents in and has maintained regular, substantial, and continuous business activity in the Midland Division and elsewhere in the Western District of Texas.

### III.    JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C.

§ 1964(c) because this action arises under federal law (RICO). Plaintiff's claims present federal questions.

17.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' related state-law claims because they form part of the same case or controversy.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Berry GP resides in the Western District of Texas. *See* 28 U.S.C. § 1391(d). Venue is also proper in this District under 18 U.S.C. § 1965(a), as each Defendant transacts affairs in or has an agent in this District.

## IV.     FACTUAL ALLEGATIONS

### A.  The Berry Family Enterprise and Plaintiff's Rights

19.     The Berry family enterprise is a conglomerate of multiple companies engaged in construction, fabrication, and maintenance businesses throughout the United States, including the Permian basin, but headquartered in Corpus Christi, Texas.

20.     The Berry Entities were founded in the 1950s by Marvin Berry. Ownership later transitioned into a structure in which Plaintiff, Marty Berry, and the estate of Dennis W. Berry owned equal shares through holding entities, including Becon and LDMA.

21.     Plaintiff is a limited partner of LDMA (including through the Trust) and a shareholder of Becon, which serves as general partner of LDMA. Plaintiff has served at relevant times as an officer, director, partner, and/or shareholder of the Berry Entities.

22.     A board of directors governs the Berry Entities. Until recently, the Berry Entities' Board of Directors consisted of Lawrence Berry, Marty Berry, and Dennis Berry. Recently, however, Dennis Berry's widow, Bonnie Berry and Hummel have become directors, as detailed below.

23.     Berry GP owns and operates a facility in Midland, Texas, at which it employs approximately 120 people. Berry GP also owns or manages approximately 50 cranes in Midland, Texas and elsewhere within the Western District of Texas.

### B.  Lawrence Berry's Discovery of Insider Loans

24.     On or about July 8, 2022, two loans totaling $75 million were purportedly entered into between Berry GP and insiders Marty Berry and Dennis W. Berry on a handshake deal and without corresponding documents (the "**Insider Loans**").  The Berry Entities had never completed a transaction of this size without documenting it contemporaneously with the transaction.

25.     Despite Plaintiff's role as officer, director, and shareholder at relevant times, Defendants blocked Plaintiff from receiving material information about the Insider Loans, including their propriety, approval, terms, and use of proceeds. For example, Marty Berry confirmed through testimony that the loans were not approved at any board meeting (where Plaintiff would have been present) and further confessed that he did not personally discuss the insider loans with Lawrence.

26.     As of October 31, 2022, the Berry Entities' combined and consolidated balance sheet reflected a "related party loan" of approximately $76 million. Plaintiff received a copy of that balance sheet on or about January 16, 2023, as part of the ordinary course of business.

27.     Shortly after he received the balance sheet, Plaintiff questioned the Berry Entities' then-CEO and CFO regarding the related-party payable and requested supporting documentation. The CEO and CFO responded to Plaintiff by sending him other loan paperwork unrelated to the Insider Loans.  Plaintiff then advised the CEO and CFO that he instead sought the documents related to the Insider Loans.  The CEO then responded that it was "not executed yet" and he would follow up.  Plaintiff responded that he knew nothing about the loans. That response caused the CEO to separately email the Berry Entities' CFO, who responded: "I would think Marty or Dennis would

have mentioned the loans," reflecting surprise at the concealment and lack of ordinary disclosure.

### C. Banking Fallout, Insider Repayment, and Information Firewall

28.     In the weeks following this revelation, the Berry Entities' longstanding relationship with IBC Bank deteriorated, stemming in part from the Insider Loans.  IBC had previously extended a $50 million revolving line of credit to the Berry Entities.  In or around March of 2023, however, IBC began questioning the Berry Entities' finances. Specifically, IBC requested conditions to continue their relationship, including subordinating the Insider Loans to debts owed to IBC.  On or about March 30, 2023, Marty Berry directed the Berry Entities to refuse that subordination request.  The relationship with IBC eventually terminated and the existing line of credit was canceled before Lawrence Berry was made aware of it.

29.     On December 7, 2023, Marty Berry signed an affidavit in state court litigation stating that "we have not been paid repaid for our loans and unlikely to recover our loan anytime soon.  This representation was false.  Marty Berry failed to disclose approximately seven month earlier, on or about April 11, 2023, the Berry Entities paid Marty Berry $10 million related to the Insider Loans, as revealed in January 2024 financial documents produced in state court discovery by Lawrence Berry.

30.     On December 7, 2023, Dennis Berry also signed an affidavit in state court litigation stating that "we have not received any interest payments."  While technically true, Dennis Berry and his estate received a $3 million interest-only payment in or around February 2024 – just two months after his representation.

31.      In the months that followed, Plaintiff sent written requests seeking financial information and records related to the Berry Entities, including the Insider Loans.  This correspondence was directed to officers and directors at the Berry Entities, including Marty Berry and Dennis Berry. Although Plaintiff was entitled to the information, Defendants failed to respond

and continued to withhold records.

32.     At or around August 2023, the Berry Entities engaged in negotiations with Frost Bank to obtain a new revolving line of credit.  As part of these negotiations, Marty Berry, Hummell, and/or Dennis Berry pledged the Berry Entities' real property as collateral, including commercial property in Corpus Christi.  Plaintiff was not fully apprised of the situation with Frost Bank, nor was he initially consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

33.     As part of these negotiations, Marty Berry executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted" at a Berry GP Board of Directors Meeting, or by unanimous written consent of the Berry GP Board of Directors. These statements were false. As Marty Berry, Hummel, and others involved in the negotiations with Frost Bank were well aware, no such Board meeting was held, and Plaintiff was not notified or asked to approve any written consent adopting the purported resolutions contained in the "Certificate of Corporate Resolutions."

34.     On information and belief, Marty Berry and other Defendants involved in securing the line of credit from Frost Bank made materially false statements about resolutions adopted by the Berry GP Board because they intended to use the line of credit to enrich themselves at the company's and Plaintiff's expense, and to conceal their self-dealing from Plaintiff.[2]

### D. <u>Post-Suit "Ratifications" and Escalation of the Scheme</u>

35.     On November 27, 2023, Lawrence Berry filed suit against Defendants in Texas district court in Harris County, which case was later transferred to Nueces County (Cause No. 2924DCV-9945-C, hereinafter the "**<u>State Court Litigation</u>**"). Shortly thereafter, Defendants

---

[2] Plaintiff has since signed resolutions authorizing the creation of the relationship with Frost Bank because it is in the best interest of the Berry Entities to receive outside financing.

attempted to "ratify" the Insider Loans and other actions through board and shareholder votes in which interested directors voted on their own self-dealing transactions over Plaintiff's objections.

36.    At Berry GP Board of Directors meetings in December 2023 and February 2024, Marty Berry and Dennis Berry voted to ratify the Insider Loans and other insider transaction as "fair" and "in the best interest" of Berry GP. Lawrence Berry voted against these resolutions.

37.    As the State Court Litigation moved forward, Defendants attempted to escalate their scheme to defraud Lawrence Berry through multiple false and/or misleading statements, dilution of Lawrence Berry's interests in the Berry Entities, and multiple transactions intended to enrich Defendants and hide their activities from Lawrence Berry.

    1.   <u>Defendants Make Materially Misleading Statements to Lawrence Berry in an April 2025 Meeting</u>

38.    On or about March 31, 2025, Plaintiff received two separate Notices of Special Meeting of Shareholders—one for Berry GP and one for Becon—to take place on April 11, 2025. The purpose of the meetings was allegedly the "appointment of four (4) directors" for each entity.

39.    On or about April 1, 2025, Plaintiff sent a request for financial reports to the Berry Entities' CFO in order to prepare for the April 11, 2025, meetings. The CFO then forwarded Plaintiff's request to Hummell. Hummell responded to Plaintiff directly (and copied the CFO), claiming that "all of our records are being made available through our respective lawyers" and instructed the CFO not to "concern [himself] with any special requests for financial records."

40.    Contrary to Hummell's representation, the Berry Entities had not provided complete financial records to Plaintiff, even though Plaintiff is entitled to receive this information as a shareholder

41.    In anticipation of the April 11, 2025, meetings, Plaintiff sent written objections

based on a lack of adequate notice and timing of these meetings.

42.    At the meeting on April 11, 2025, Plaintiff reiterated his objections to the meetings, including the lack of financial information necessary to make informed decisions. Marty Berry, Bonnie Berry, and Hummell disregarded Plaintiff's objections and proceeded with the meeting.

43.    At the meeting, Marty Berry acknowledged problems regarding the Berry Entities' finances and proposed a consolidation of existing debts owed by the Berry Entities in order to clean up the companies' books and be able to bid for work.  Marty Berry then explained that after consultation with unidentified "different attorneys," he planned to convert his and Dennis Berry's outstanding debt into stock equity and "take the debt off the company" as an "ongoing concern" in the coming days.  Marty Berry further represented that after that conversion of debt to equity was made, new lenders were lined up to take over and consolidate the remaining debts of the Berry Entities. At the meeting,  Marty Berry portrayed this debt-to-equity conversion as an act of generosity on his part and the part of Bonnie Berry, in her capacity as Independent Executor of Dennis Berry's estate to help the company. Marty Berry urged Plaintiff to "do the same thing" and threatened that if Plaintiff did not participate, Plaintiff's interests would be "diluted."

44.    Marty Berry's representations to Lawrence Berry were false and/or materially misleading. Marty Berry and the other Defendants present at the meeting did not disclose that Marty Berry, through Western Gulf and with the knowledge and participation of other Defendants, had been engaged in a secret scheme to lease equipment to the Berry Entities, to secure those lease obligations with valuable real estate owned by the Berry Assets, and then (at a time of Marty Berry's choosing) to foreclose on those assets and transfer ownership to Western Gulf and/or Marty Berry, as detailed below. Marty Berry also did not disclose the terms of the loan arrangements Defendants were in the process of negotiating, which (as further detailed below) expressly excluded the hidden security arrangements between Western Gulf and the Berry Entities

from the debts required to be consolidated or paid prior to execution of the loan agreements.

45.    Marty Berry made these false and/or materially misleading statements in an attempt to deceive Lawrence Berry into agreeing to the debt conversion. Plaintiff nonetheless abstained from taking any action at this meeting, citing a lack of information. But the remaining shareholders purportedly elected the following directors: (1) Crissy Hinojosa; (2) Bonnie Berry; (3) Mike Hummell; and (4) Marty Berry. Each of these board members were present and active participants at the April 11, 2025, meeting, including discussions regarding the conversion of the Insider Loans into equity. Bonnie Berry and Hummel were aware that Marty Berry's statements to Lawrence Berry were false and/or materially misleading for the reasons stated above but did not disclose the truth to Lawrence Berry during the meeting.

2.    <u>CSMB and Connolly helped structure the transaction and further Defendants' scheme to defraud Lawrence Berry.</u>

46.    CSMB and Connolly played a critical role in Defendants' scheme to deprive Lawrence Berry of the value of his interests in the Berry Entities. Beginning in or around August 2024, the Berry Entities engaged CSMB and/or Connolly, purportedly to "evaluat[e] and develop[] other financing options to support the needs of Berry GP specifically, and [the] Berry Companies generally." Defendants directed the Berry Entities to compensate CSMB with a $15,000 due diligence fee and a $5,000 retainer monthly. In addition, Gerry GP agreed to reimbursed CSMB for its expenses and pay an additional fee upon the closing of a successful transaction, a blended average of approximately 9/10 of 1% of a successful transaction up to $885,000.

47.    The Defendants hid the hiring of CSMB and Connolly from Lawrence Berry, who did not learn of the Defendants' actions until Defendants filed an affidavit from Connolly the State Court Litigation on or about May 1, 2025. Connolly confirmed in his affidavit that he had been hired in August 2024—nearly nine months prior.  On information and belief, Defendants' actual

purpose in engaging CSMB, Connolly, or both—as CSMB and Connolly well knew—was to make the Berry Entities' financial health look better than it actually was, to cover up Defendants' wrongdoing and avoid liability in the State Court Litigation, and to further Defendants' scheme to defraud Lawrence Berry.

48.    In his May 1, 2025, affidavit, Connolly states that he was "engaged" as a financial advisor by the Berry Entities and provided detailed financial books and records with which he became "extremely familiar." Defendants have refused to provide these same records to Lawrence Berry, even after service of discovery requests in the State Court Litigation.

49.    Notably, while keeping Lawrence Berry in the dark about the Berry Entities' financials and management, the Defendants shared detailed company financial books and records with CSMB and Connolly, including communications about financial issues raised by the Berry Entities' auditor. In fact, well before the April 11, 2025, meeting, CSMB and Connolly learned that financial issues surrounding the Insider Loans were risking the Berry Entities from receiving a qualified audit opinion, which Defendants believed to be essential to securing adequate financing for the Berry Entities' operations and to provide additional funds to divert to Defendants.

50.    Defendants further shared with CSMB and Connolly the ongoing need for capital, which was jeopardizing its existing work-in-progress obligations as well as ability to repay the Insider Loans and enrich Marty Berry and Bonnie Berry. CSMB and Connolly failed to disclose this information and orchestrated various actions concerning the Berry Entities finances to Lawrence Berry, which furthered Defendants' scheme to defraud Lawrence Berry.

51.    Connolly, on behalf of himself, CSMB, and the other Defendants, and in regular consultation with them, helped negotiate the $150 million loan to the Berry Entities. As noted above, this loan agreement included an express carve-out for the Berry Entities agreements with Western Gulf, which Defendants attempted to conceal from Lawrence Berry.

52.     Connolly and other Defendants were also well aware that Lawrence Berry was attempting to uncover their schemes, including through an upcoming hearing in the State Court Litigation. On April 8, 2025, as Lawrence Berry was pressing for additional information regarding the Berry Entities' finances, Connolly sent an email to a colleague stating that "we need to get this [loan agreement] to a signed doc this week come hell or high water," expressing his belief that Defendants needed to lock the Berry Entities into the loan agreement prior to hearings in the State Court Litigation in which Lawrence Berry could learn of details of the loan agreement and/or potentially stop the Berry Entities from executing the agreement.

53.     Two days before the hearing, on April 29, 2025, Defendants caused Berry GP to issue preferred stock certificates to Marty Berry and Bonnie Berry,[3] creating a new class of stock and altering the ownership structure such that Marty Berry and Bonnie Berry became direct shareholders of Berry GP, whereas previously the sole shareholder was LDMA. Defendants primarily used the book value (as opposed to the fair market value) of Berry GP to value amount of ownership interests to be represented by the preferred shares, based on the amounts of the Insider Loans. The use of book value to calculate the value of the preferred shares, by itself, resulted in a diminution of Lawrence Berry's interest in the Berry Entities, perhaps causing a loss to Lawrence Berry of up to $100 million.

54.     Connolly, with the knowledge and encouragement of the other Defendants, also attempted to further the scheme through false and/or misleading testimony. On May 1, 2025, the court in the State Court Litigation held a hearing on Lawrence Berry's request for a Temporary Restraining Order to stop the dilution scheme. On behalf of the Defendants, Connolly testified that any efforts by Plaintiff to stop the refinancing and debt-to-equity conversion based on breaches of

---

[3]     Notably, the stock certificate was issued to Bonnie Berry, Individually, rather than as the Independent Executor of Dennis Berry's Estate.

fiduciary duties were moot because the "ship had sailed," testifying that the document accepting

the lender's offer "was signed and delivered April 11th" and included provisions requiring that the

Berry Entities pay of "$49,167 per day as of [April 30, 2025,]" if the Berry Entities did not

withdraw the loan proceeds from escrow:

```
 6      Q.   Has that ship already sailed?
 7      A.   That ship has sailed.  Document accepting the
 8   lender's offer to do this loan was signed and delivered
 9   April 11th.  It has very punitive provisions that we
10   have requested their investors put in escrow of $150
11   million.  Once that was requested, if the company does
12   not, for any reason, take that money down, they are
13   paying $49,167 a day as of yesterday as the dollars have
14   been escrowed, and those have been on the way, took 15
15   days for the investors to pull money out of their
16   accounts and then send into escrow for Berry.
```

55.     Connolly further testified that the $150 million in loan proceeds was in escrow and

available to be withdrawn by the Berry Entities as of April 30, 2025:

```
17      Q.   And what's the amount then that the interest
18   and everything would be on?  Let me ask you this:  Has
19   -- what's the amount then that you'd be subject to those
20   penalties on?
21      A.   $150 million outstanding, and in escrow, as of
22   yesterday or even the day before yesterday whenever
23   arrived into the lender's escrow account.
```

```
10      Q.   And so the loan itself, the funds are in the
11   lender's escrow account; is that correct?
12      A.   Correct.
```

56.     Connolly's testimony was false. As Connolly and all other Defendants were well aware, the loan agreement had not yet closed. Indeed, documents later turned over in discovery in the State Court Litigation revealed that the lenders and Berry Entities did not execute the Loan and Security Agreement (the "**Loan Agreement**") until *May 8, 2025*.[4] Moreover, on information and belief, the loan proceeds were not made available to the Berry Entities until *after* the Loan Agreement was fully executed, contrary to Connolly's testimony.

57.     Defendants, and others working with them, knew that Connolly's testimony was false and/or materially misleading but did not correct Connolly's testimony or otherwise inform the Court that the Loan Agreement was not executed until May 8, 2025. Instead, they permitted Connolly's false and/or misleading testimony to stand and asked the Court to deny Plaintiff's request for a temporary restraining order, which the Court did on May 2, 2025. Defendants did so to prevent Plaintiff from stopping their scheme to deprive Plaintiff of his economic interests in the Berry Entities.

> 3.     Defendants falsely claim to amend Berry GP's Articles of Incorporation prior to issuance of the preferred shares.

58.     During the May 1 hearing in the State Court Litigation, Plaintiff's counsel pointed out that Berry GP's Articles of Incorporation did not permit Gerry GP to issue anything other than *common* shares:

ARTICLE VI

Article VI (1) of the Articles of Incorporation is hereby amended so as to read as follows: The Aggregate number of shares which the corporation shall have authority to issue is 200,000 shares of the par value of $50.00 each, all of which shall be common voting shares and subject to all of the provisions of the Articles of Incorporation pertaining thereto, the purpose of this Amendment being only to increase authorized capital shares to 200,000 shares of said par value $50.00 per share.

---

[4]     The Loan Agreement was not made available to Lawrence Berry until it was produced in discovery on or about November 25, 2025.

Berry GP therefore had no authority to issue preferred shares on April 29, 2025, and the preferred shares issued to Marty Barry and Bonnie Berry on that date were invalid.

59.     At the May 1 hearing, Defendants did not claim that the Berry GP Board of Directors had voted to change its Articles of Incorporation. Nor could Defendants make such a claim, as the question of whether to amend Berry GP's Articles of Incorporation was not raised in the April 11 meeting. On information and belief, in their rush to issue the preferred shares before the hearing, Defendants did not consider the need to amend Berry GP's Articles of Incorporation until Plaintiff's counsel raised the issue.

60.     On information and belief, in an attempt to fabricate a paper trail and further Defendants' scheme to defraud Lawrence Berry, Defendants agreed to create an Amended and Restated Certificate of Formation of Berry GP, Inc. (the "**Amended Certificate**") and falsely claim that the Amended Certificate was executed on April 11, 2025, when in fact it was not drafted and executed until sometime after May 1, 2025. Hummell drafted and signed the Amended Certificate sometime between May 1 and May 8, 2025, but falsely claimed that he "executed" the document on April 11, 2025:

> **IN WITNESS WHEREOF**, the undersigned has executed this document as of the *11* day of *april* , 2025.
>
> _Mike Hummell_
> Mike Hummell, VP/GC

61.     On or about May 8, 2025, Hummell electronically filed the Amended Certificate with the Texas Secretary of State, falsely claiming—subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument—that the Amended Certificate was filed on April 11, 2025:

**Execution**

The undersigned affirms that the person designated as registered agent in the restated certificate of formation has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:    05/08/2025

Berry GP, Inc.
Name of entity (see Execution instructions)

*Mike Hummell*
Signature of authorized individual (see instructions)

Mike Hummell, Vice President & General Counsel
Printed or typed name of authorized individual

On information and belief, the other Defendants were aware that the Amended Certificate falsely represented that it had been executed on April 11, 2025, and agreed to its filing with the Texas Secretary of State.

62.     Defendants' attempts to falsely backdate the Amended Certificate were still not sufficient to the legitimize the pre-Amendment issuance of preferred shares. As detailed in the form through which the Amended Certificate was filed, the amendment only becomes effective on the date it is filed with the Texas Secretary of State:

**Effectiveness of Filing** (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: _____
The following event or fact will cause the document to take effect in the manner described below:

As the form was not filed until May 8, 2025, Berry GP did not have the authority to issue preferred

shares until that date. The preferred shares issued to Marty Berry and Bonnie Berry on April 29, 2025, were therefore invalid and of no legal effect.

63.    The preferred shares were identified as collateral of the Berry Entities in the Loan Agreement. Yet, on information and belief, Defendants failed to disclose that the preferred shares were invalid to the lenders and other signatories of the Loan Agreement prior to execution of the Loan Agreement, execution of any of the subsequent amendments to the Loan Agreement, at any time Defendants caused the Berry Entities to access the loan funds, or in any communications with the lenders or their agents regarding the loan or the loan amendment (discussed below). The failure to provide that notice renders the execution of Loan Agreement, amendments to the Loan Agreement, the acceptance and use of the loan proceeds, and each communication with the lenders or their agents false and/or materially misleading, as the preferred shares provided collateral for the loans under the Loan Agreement.

4.    Defendants attempt to deceive Plaintiff into providing the Berry Entities with millions of dollars.

64.    On May 15, 2025, Hummell sent a letter to Lawrence Berry via email. The letter claims that debt-to-equity swap "eliminates $65 million of company debt," notes that preferred stock had been issued to Marty Berry and Bonnie Berry, and that unpaid interest to Marty Berry and Bonnie Berry on the Insider Loans would be "subordinate to the debt created under our refinancing arrangements." The letter then represents that Lawrence Berry can only participate equally" with Marty Berry and Bonnie Berry in Berry GP if Lawrence Berry either contributes $32.5 million to Berry GP or purchases one third of the preferred shares for approximately $22 million. Hummell asked Lawrence Berry to inform "us" of his decision on or before July 1, 2025.

65.    Hummell's letter did not disclose the terms of the Loan Agreement or the existence

of the Berry Entities agreement with Western Gulf. That omission made the letter false and/or materially misleading, as Western Gulf's agreements with the Berry Entities diverted substantial funds to Marty Berry and gave Marty Berry the ability to seize ownership of some of the most valuable assets of the Berry Entities, as detailed below. Hummel was well aware of the terms of the Loan Agreement and Western Gulf's agreements with the Berry Entities, but he did not disclose to terms in an effort to deceive Lawrence Berry into providing the Berry Entities with tens of millions of dollars.

   5.   Defendants Again Attempt to Deceive Plaintiff into Providing the Berry Entities with Millions of Dollars.

66.    On or about September 26, 2025, Lawrence Berry received a letter from Hummell. According to the letter, the Berry Entities were purportedly on the verge of defaulting on the Loan Agreement, the terms of which had not yet been provided to Lawrence Berry:

> We continue our efforts to manage the relationship with our lenders, but circumstances have made this difficult. Our cash flow over the past few months has been less than anticipated and the lenders have grown increasingly abusive. Next week, on September 30th, we expect they may be in a position to put us in default for violation of a loan covenant. Only a swift increase in cash on hand will change that, and we don't anticipate having enough money coming in over the next few days.

> The danger to the company is extreme and imminent. We just got a $44 plus million-dollar PO for fabrication, a $14 million-dollar tank job and a couple nice highway

67.    Hummell also warned that if the default was not cured, the Berry Entities' lenders could potentially foreclose and seize valuable and unique Berry Entities' real property, which was pledged as collateral as part of the Refinancing:

> insisted on a massive amount of collateral. If they shut us down and sell the assets there will not be much left, if anything. The office building, yard, and dock will likely be the first to go. If you are going to help, don't delay or it likely will not matter. If you have

68.    Notably, Hummell failed to mention the potential foreclosure of the preferred shares issued to Marty Berry and Bonnie Berry, which were also pledged as collateral and an "absolute requirement as part of the refinancing." Hummel also failed to disclose the Berry Entities agreements with Western Gulf, which diverted millions of dollars from the Berry Entities to an entity controlled by Marty Berry. Both omissions made the letter and the representations regarding the financial state of the Berry Entities false and/or materially misleading.

69.    On or about October 1, 2025, Lawrence Berry responded to Hummell's September 26, 2025, correspondence—yet again—requesting additional information on such substantial issues, including a potential default and repossession of valuable company real property, including its headquarters, yard, and dock.

70.    On or about November 25, 2025, Lawrence Berry received in discovery in the State Court Litigation an executed version of the Loan Agreement and the Second Amendment to Loan and Security Agreement executed by the Berry Entities and various lenders related to the Refinancing (the "**Amended Loan Agreement**," and with the Loan Agreement, the "**Loan Agreements**")—the first time that Lawrence Berry had been able review these critical agreements. Upon reviewing these documents, on or about December 1, 2025, Lawrence Berry requested additional information from Marty Berry, Bonnie Berry, and the Berry Entities pertaining to the Loan Agreements, including, among other things: (a) whether the Berry Entities were in full compliance with the terms of the Amended Loan Agreement; (b) whether any event of default has occurred and details about such events; and (c) amounts of funds the Berry Entities have repaid under the Loan Agreements.

71.    On or about December 2, 2025, Hummell responded to Lawrence Berry's December 1, 2025, correspondence that continued to paint a dire (and materially misleading) financial outlook for the company, yet another refusal to provide key financial information, and

further demands for a cash infusion from Lawrence Berry:

> As predicted in the letter to you back on September 26, 2025, our lender remains very aggressive. We continue to fight with our lenders based upon the company's financial position and the lack of the cash infusion I requested from you. That is really tragic since

> You will not receive any additional information concerning the Company financial situation by the end of the day today. You have repeatedly used the information to damage the Company through publication of this sensitive information. If you can agree to keep the information to yourself, and only to yourself, we can discuss the extent to which some of your questions can be answered.

72.     On or about December 5, 2025, Lawrence Berry responded to Hummell's December 2, 2025, letter making a second request for information set forth in the December 1, 2025, letter for information regarding the Loan Agreements.

73.     Hummell responded later that same day, making continued false allegations that Lawrence Berry owed the Berry Entities money and expressing "grave concerns" regarding the future of the Berry Entities. Moreover, Hummell and the Berry Entities—again—refused to provide any of the requested documents by Lawrence Berry.

74.     On or about December 10, 2025, Hummell (purportedly on behalf of Berry GP) sent a letter via email to Lawrence Berry, Marty Berry, and Bonnie Berry requesting a contribution of $15 million within six days based on a need to infuse cash and "improve cash flow" for the Berry Entities going into the first two quarters of 2026:

> Dear Owners:
>
> The Berry GP Board of Directors met yesterday and discussed the current need for a cash infusion to carry us until we are able to improve cash flow. We have several jobs working at the moment and an impressive pipeline for the first two (2) quarters in 2026. We need some help to get there, and we believe that $15 million will make that possible.

Hummell further intimated that an "asset sale" could be used to pay any funds paid pursuant to this request and was not eliminating the possibility of converting *further debt* into equity in the

company:

> create the opportunity for us to pay the loan. At this time, we do not anticipate a need to convert the debt to equity, but we can't eliminate that possibility. There are many variables in play. A response by Friday, December 12, 2025 is appreciated.

75.    On or about December 12, 2025, Lawrence Berry responded to Hummell's December 10, 2025, letter. Lawrence Berry again reiterated his frustration with being "intentionally kept in the dark while decisions were made that appear to have materially harmed" the Berry Entities. Nevertheless, Lawrence Berry expressed a willingness to make the call for millions in capital to help the Berry family enterprise, but not first without the disclosure of key and material documents regarding the company's finances:

> Bay is not just a balance sheet. The company has an obligation to the thousands of men and women who have worked here over the years—people who helped build this company with their hands, their skill, and their loyalty, and who helped create the opportunities our families have benefited from. I care deeply about the community Bay serves and the employees and families who depend on it. If there is a responsible way to support a real turnaround, with accountability and transparency, I want to be part of that solution.

Lawrence Berry then asked that the requested documents be sent to him as soon as possible for meaningful consideration of the request.

76.    Five days later on December 17, 2025, Lawrence Berry received from the Berry Entities a blank Confidentiality Agreement "that will support the access to the financial records" he requested:

> ### CONFIDENTIALITY AGREEMENT
>
> **THIS CONFIDENTIALITY AGREEMENT** (the "**Agreement**") is made and entered into as of December 15, 2025 by and between Berry GP, Inc., a Texas corporation (the "**Disclosing Party**"), and Allen Lawrence Berry (each, and/or collectively, a "**Recipient**"). Each of the Disclosing Party and the Recipient may be referred to individually as a "**Party**" and collectively they may be referred to as the "**Parties**".

The agreement included multiple objectionable terms, including provisions that would confirm that Marty Berry, Bonnie Berry, and the Berry Entities could ***continue to withhold documents***

requested by Lawrence Berry, whether through formal discovery or informal requests regarding the company's finances.

77.    On or about December 19, 2025, Lawrence Berry responded to the proposed Confidentiality Agreement. Lawrence Berry highlighted that not only was the proposed Confidentiality Agreement highly improper but also further underscored the wrongfulness of asking him to loan millions of dollars to the Berry Entities without disclosing the Berry Entities' "true financial status." Yet again, Lawrence Berry urged his requests for information without a Confidentiality Agreement.

78.    Later that same day, Hummell provided a hollow response and failed to provide Lawrence Berry with his requested information:

> I don't think anything more needs to be said here.

79.    On information and belief, Hummell's representations regarding the financial state of the Berry Entities were false. In or about December 2025, Marty Berry told a third party that Hummell was misrepresenting that the Berry Entities were in dire financial straits in order to convince Lawrence Berry to contribute additional funds to the Berry Entities.

### E.  Discovery of Western Gulf Self-Dealing and Over-Collateralization

80.    On information and belief, Western Gulf is wholly owned by Marty Berry and his wife, Courtenay Berry, and the registered address for Western Gulf is the Berry Entities' headquarters in Corpus Christi. The registered agent for Western Gulf is Mike Hummell. On information and belief, Hummell assisted Marty Berry in structuring and drafting agreements for transactions involving Western Gulf and the Berry Entities. Connolly and CSMB are also aware of the terms of Western Gulf's agreements with the Berry Entities, as Connolly negotiated the Loan Agreement and thus was aware of its provisions regarding Western Gulf. On information

and belief, Marty Berry uses corporate assets of the Berry Entities to operate Western Gulf for his own personal gain.

81.     Western Gulf was originally established as a special purpose entity that purchased a portion of a crane in Canada in conjunction with a Canadian affiliate of the Berry Entities and then lease the crane back to that Canadian affiliate.  According to documents received in discovery in the State Court Litigation,  this original transaction took place in approximately 2021. Lawrence Berry was aware that the Canadian affiliate had leased a crane and had suspicions about other equipment leases involving Marty Berry, but he was not aware of the details of any such leases, the involvement of Western Gulf, or any other transactions between Western Gulf and the Berry Entities until November 2025.

82.     In November 2025, Defendants produced in discovery in the State Court Litigation documents that revealed, to a limited extent, the manner in which Marty Berry (with the knowledge and assistance of the other Defendants) used Western Gulf to further Defendants' scheme to defraud. These documents included an Equipment Rental Agreement (Lease) dated May 8, 2025 (the "**Rental Agreement**"), which was signed by Marty Berry on behalf of Western Gulf. The Rental Agreement purported to lease a total of *seven cranes* owned by Western Gulf to one of the Berry Entities for 36 months at monthly rates ranging from $49,000 to $70,000 per crane. The Rental Agreement also required the Berry Entities to pay for all maintenance and repairs of the cranes throughout the life of the agreement.

83.     The Rental Agreement states that each of the cranes leased by Western Gulf to the Berry Entities are used in "[v]arious locations in Texas." On information and belief, the cranes that Western Gulf leased to the Berry Entities through the Rental Agreement are located in and managed by the Berry Entities in the Midland, Texas area and elsewhere in the Western District of Texas.

84.    The Rental Agreement also includes a security agreement, through which the Berry Entities give Western Gulf a security interest in real property owned by the Berry Entities in Nueces and San Patricio County, Texas and in a property owned by the Berry Entities in McMullen County, Texas. The Rental Agreement references Performances Deed of Trust and Security Agreement between one of the Berry Entities and Western Gulf regarding the properties in McMullen County and San Patricio County. Defendants have thus far refused to produce in discovery any of the agreements referenced in the Rental Agreement.

85.    Plaintiff was nonetheless able to locate Performance Deeds in public records in McMullen County and San Patricio County. The Performance Deed of Trust and Security Agreement filed in McMullen County (the "**McMullen Performance Deed**") is dated April 30, 2025, and gives Western Gulf a mortgage interest in a property identified in Exhibit A to the McMullen Performance Deed, including on all buildings, fixtures, and rights to the property, apparently including all mineral rights on the property. The property identified in Exhibit A to the McMullen Performance Deed is the McMullen Ranch, which has been owned by the Berry Entities since the mid-1970s and has been improved and upgraded over time by the Berry Entities. The McMullen Ranch is widely known and famous for having the biggest white-tail deer for hunters and has been proven to be a reliable source of revenue for the Berry Entities. The value of the McMullen Ranch's surface and mineral estates is believed to be at least $150 million.

86.    The Performance Deed of Trust and Security Agreement filed in San Patricio County (the "**San Patricio Performance Deed**," and jointly with the McMullen Performance Deed, the "**Performance Deeds**") is dated April 30, 2025, and gives Western Gulf a mortgage interest in a property identified in Exhibit A to the San Patricio Performance Deed, including on all buildings, fixtures, and rights to the property, apparently including all mineral rights on the property. The property identified in Exhibit A to the San Patricio Performance Deed is a property

owned by Berry Entities that is believed to be at least $30 million.

87.    As noted above, in November 2025, Defendants also produced the Loan Agreements in discovery in the State Court Litigation. The Loan Agreement excludes the McMullen Ranch and the San Patricio Ranch from the collateral supporting the agreement, identifies the debts owed to Western Gulf under Rental Agreement as debts that the Berry Entities do not need to pay off prior to execution of the Loan Agreement, and otherwise largely excludes agreements and interests of Western Gulf from key provisions of the Loan Agreement. The Amended Loan Agreement retains these terms.

88.    Defendants did not disclose the existence of the Rental Agreement or the Performance Bonds to Lawrence Berry until forced to do so in discovery in the State Court Litigation and through public record searches. The failure to disclose those agreements prior to that date rendered virtually every communication between Defendants and Lawrence Berry regarding the financial status of the Berry Entities false and/or materially misleading, including Hummell's repeated requests that Lawrence Berry contribute millions of dollars to the Berry Entities and Marty Berry's April 11, 2025, invitation for Marty Berry to agree to the debt-equity swap. The existence of these agreements was plainly material to Lawrence Berry, for several reasons.

89.    First, the Rental Agreement would divert at least $379,000 per month—for a total of $13,644,000 over the life of the agreement—from one of the Berry Entities to an entity owned and controlled by Marty Berry, a staggering amount of money at a time Defendants falsely claimed the Berry Entities were experiencing cash flow shortages.

90.    Second, as the Rental Agreement was an interested-party transaction, Defendants were required to notify the Board of Directors and obtain approval from non-interested Directors prior to its approval. On information and belief, Defendants did not provide that notice or obtain

that approval. Hiding the Rental Agreement and Loan Agreements from Lawrence Berry helped Defendants avoid liability in the State Court Litigation and other ongoing disputes between the parties.

91.    Third, the McMullen Ranch and the Berry Entities' property in San Patricio County are far too valuable to serve as justifiable collateral for Western Gulf under the Rental Agreement. The ranch alone is worth at least 10 times more than the total value of all payments to Western Gulf under the Rental Agreement. Indeed, the cranes themselves were of sufficient value to provide security for the Rental Agreement and, if they were not, the other property identified in the Rental Agreement was certainly more than sufficient. The Rental Agreement and Performance Bonds thus served little purpose other than to provide Marty Berry with cover for the theft of some of the most valuable assets of the Berry Entities.

92.    Fourth, the assets of the Berry Entities identified as collateral in the Loan Agreements significantly exceeds the value of the amounts loaned to the Berry Entities pursuant to those agreements. On information and belief, Berry GP's CFO was terminated, in part, because he questioned the over collateralization of corporate assets required by the Loan Agreements. The amount of collateral suggests that it is the goal of the Defendants, perhaps with the cooperation of the lenders in the Loan Agreements, to impose debt obligations on the Berry Entities that cannot be serviced and then to foreclose on those debts, thereby diverting valuable assets of the Berry Entities to Defendants and others – and leaving Lawrence Berry and the Nominal Plaintiffs with nothing.

93.    Theft—even papered over by clever lawyers—is still theft. Marty Berry and the other Defendants knew that Lawrence Berry would never agree to allow Marty Berry to take the McMullen Ranch and other valuable assets away from the company built by their father—not without a substantial fight or, at the least, fair compensation to the Berry Entities and/or Lawrence

Berry. Thus, Marty Berry and the other Defendants concocted a scheme to hide their true intention from Lawrence Berry, dilute Lawrence Berry's interests and control over the Berry Entities, burden key company assets with sham security agreements, and then divert into their portfolios the Berry Entities most valuable assets—all through fraud, false statements, perjury, and deceit.

## V.    <u>CIVIL RICO ALLEGATIONS</u>

### A.  The RICO Enterprise (18 U.S.C. § 1961(4))

94.     Plaintiff alleges an association-in-fact enterprise (the "**<u>Enterprise</u>**") consisting of Marty Berry, Bonnie Berry, Hummell, CSMB, Connolly, Western Gulf, and associated entities and agents.

95.     The common purposes of the Enterprise included: (a) diverting assets of the Berry Entities to companies owned or controlled by the Enterprise; (b) diminishing the value of Plaintiff's interests in the Berry Entities as retaliation for his exercise governance and legal rights; (c) concealing insider and self-dealing transactions; (d) shifting value and control of the Berry Entities to the Enterprise; (d) extracting fees and benefits from the Berry Entities for Enterprise members; and (e) controlling and operating the businesses owned by the Berry Entities.

96.     The Enterprise had relationships among its members, including continuous coordination and communication among insiders (Marty and Bonnie Berry), in-house counsel/gatekeeper functions (Hummell), deal facilitation and lender-interface functions (CSMB/Connolly), and a self-dealing operating vehicle (Western Gulf).

97.     The Enterprise engaged in, and its activities affected, interstate commerce through communications with banks and professionals, transmission of loan and security documents by email and other wires, and movement of funds through interstate banking channels.

98.     Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, including as detailed herein.

99.    Among other relevant actions detailed above and expected to be revealed in discovery, Marty Berry created Western Gulf and directed its activities; created and engaged in self-dealing transactions with the Berry Entities designed to enrich himself and the other members of the Enterprise, at the expense of the Berry Entities and Lawrence Berry; made false and/or materially misleading statements to Lawrence Berry and others in furtherance of a scheme to defraud Lawrence Berry and advance the Enterprise's goals; directed, participated in, and approved the drafting of agreements that furthered the Enterprise's goals, including the Loan Agreements, the Rental Agreement, and the Performance Deed; encouraged and helped facilitate false testimony and other statements by other members of the Enterprise in furtherance of the Enterprise's goals; took various measures to dilute Lawrence Berry's interests in the Berry Entities; and actively concealed the activities of the Enterprise from Lawrence Berry.

100.    Among other relevant actions detailed above and expected to be revealed in discovery, Hummell facilitated the creation and activities of Western Gulf; participated in and/or ratified self-dealing transactions between members of the Enterprise and the Berry Entities, including by accepting a position on the Board of Directors of Berry GP and voting to approve transactions and ratify prior self-dealing by other Defendants; made false and/or materially misleading statements to Lawrence Berry and others in furtherance of a scheme to defraud and the Enterprise's goals; filed a false or materially misleading document with the Texas Secretary of State under penalty of perjury; drafted and/or approved agreements that furthered the Enterprise's goals, including the Loan Agreements, the Rental Agreement, and the Performance Deed; encouraged and helped facilitate false testimony and other statements by other members of the Enterprise in furtherance of the Enterprise's goals; and actively concealed the activities of the Enterprise from Lawrence Berry.

101.    Among other relevant actions detailed above and expected to be revealed in

discovery, Bonnie Berry participated in and/or ratified self-dealing transactions between members of the Enterprise and the Berry Entities, including by accepting a position on the Board of Directors of Berry GP and voting to approve transactions and ratify prior self-dealing by other Defendants; made or failed to correct false and/or materially misleading statements to Lawrence Berry and others in furtherance of a scheme to defraud and the Enterprise's goals; approved and/or executed agreements that furthered the Enterprise's goals; encouraged and helped facilitate false testimony and other statements by other members of the Enterprise in furtherance of the Enterprise's goals; and actively concealed the activities of the Enterprise from Lawrence Berry.

102.    Among other relevant actions detailed above and expected to be revealed in discovery, Connolly and CMSB facilitated the activities of Western Gulf, including through the negotiation of the Loan Agreements; participated in and/or ratified self-dealing transactions between members of the Enterprise and the Berry Entities, including through the negotiation of the Loan Agreements; gave false and/or materially misleading in the State Court Litigation in furtherance of a scheme to defraud Lawrence Berry and advance the Enterprise's goals; and actively concealed the activities of the Enterprise from Lawrence Berry.

103.    Among other relevant actions detailed above and expected to be revealed in discovery, Western Gulf entered into sham agreements with the Berry Entities that served little purpose other than to provide the Enterprise a means to divert assets of the Berry Entities to Western Gulf and other members of the Enterprise, including the Rental Agreement and the Performance Bond.

### B.  Predicate Acts and Pattern of Racketeering Activity (18 U.S.C. §§ 1341, 1343, 1961(5))

104.    Throughout the course of this scheme, the Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) various documents that furthered the

goals of the Enterprise and Defendants' scheme to defraud Lawrence Berry and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

105.    In furtherance of the scheme, Defendants knowingly and with intent to defraud used or caused to be used the United States Postal Services in multiple ways, including without limitation: Defendants created entities, including without limitation Western Gulf, through filings and other documents submitted through the United States Mail and with knowledge that the creation of such entities would result in documents from government authorities to be sent to Defendants and others through the United States Mail; entered into agreements, including without limitation the Loan Agreement and the Amended Loan Agreement, that required escrow instructions, bank statements, and other documents to be sent between parties to those agreements and to others through the United States Mail; and entered into agreements, including without limitation the Rental Agreement, that diverted funds from the Berry Entities to Western Gulf and other Defendants through invoices, payments, and various communications sent through the United States Mail.

106.    In addition, to further the scheme to defraud Lawrence Berry and advance the goals of the Enterprise, Defendant knowingly and with intent to defraud used or caused to be use interstate wire facilities, including the following: email communications between Defendants and Lawrence Berry communicating requests that Lawrence Berry contribute funds to the Berry Entities, regarding Lawrence Berry's requests for financial records and other documents regarding the Berry Entities, and otherwise attempting to conceal Defendants' activities from Lawrence

Berry; emails between Defendants and lenders to the Berry Entities pursuant to the Loan Agreements, their agents, or others involved in the negotiation, drafting, and execution of the Loan Agreements; emails between and among Defendants regarding their efforts to carry out their scheme to defraud Lawrence Berry, as detailed above; wire transfers between financial institutions in different states, including without limitation transfers of funds pursuant to the Insider Loans, the Loan Agreements, and the Rental Agreement. On information and belief, Defendants and Lawrence Berry utilized email communications services that routed email communications through servers located in states other than Texas.

107. These predicate acts of wire and mail fraud in furtherance of the scheme defraud Lawrence Berry and advance the goals of Enterprise took place at various times between 2022 and the present.

108. Representative examples of predicate acts include the following, in addition to those noted above. Plaintiffs will supplement additional communications, routing details, and participants after discovery:

| No. | Date | Predicate | Description |
|-----|------|-----------|-------------|
| 1 | Jan. 16, 2023 | Wire Fraud (18 U.S.C. § 1343) | Email communications regarding the undisclosed insider loans and the failure to disclose those loans to Plaintiff; internal acknowledgment that Plaintiff had not been informed. |
| 2 | Apr. 24, 2025 | Wire Fraud (18 U.S.C. § 1343) | Connolly transmitted "conversion documents" authorizing issuance of stock for debt-to-equity conversion and designed to anticipate future refinancing; recipients included lender representatives, counsel, and Berry insiders |

| 3 | Apr. 25, 2025 | Wire Fraud (18 U.S.C. § 1343) | Lender counsel requested preferred stock issuance documents, stating lenders would want to see them, reflecting induced reliance for financing/collateralization. |
| 4 | Apr. 8, 2025 | Wire Fraud (18 U.S.C. § 1343) | Connolly email urging deal completion "come hell or high water," reflecting intent to close financing despite unresolved conditions and missing documents. |
| 5 | May 5, 2025 | Mail and/or Wire Fraud (18 U.S.C. §§ 1341, 1343) | Closing/escrow instructions transmitted to a title company by email and/or mail setting an expected closing date of May 7, 2025, contradicting representations that closing had already occurred. |
| 6 | May 6, 2025 | Wire Fraud (18 U.S.C. § 1343) | Email communications reflecting key documents were still missing and the refinancing had not closed, contrary to representations made to influence the Court and stakeholders. |

## VI.    <u>DERIVATIVE STANDING</u>

109.    Lawrence Berry is a 19% limited partner of LDMA.  Lawrence Berry is also the Trustee of the Allen Lawrence Berry Trust, which is a 11 2/3% limited partner of LDMA.  LDMA owns Berry GP, which is the umbrella company over the Berry Entities and their subsidiaries.

110.    Lawrence Berry is also a 1/3 shareholder of Becon, which is the 3% general partner of LDMA.

111.    Lawrence Berry—in his personal capacity and as Trustee of the Allen Lawrence Berry Trust—has standing to bring these claims directly and derivatively on behalf of LDMA, Becon, and Berry GP, pursuant to Texas Business Organizations Code §§ 21.563 & 153.413, as well as Texas common law providing for representative actions in closely held limited partnerships

and corporations.

112.    Despite their father's wishes that the Berry Entities operate as a family business, it has become clear that Marty Berry, Dennis Berry, with the complicity, assistance, and aid of Hummell, Connolly, and CSMB, have gone behind Lawrence Berry's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors (which at the time included Lawrence Berry) of their actions.

113.    In addition to the breaches of fiduciary duties detailed above, and by way of example and not limitation, in the past several years, Defendant Marty Berry and Bonnie Berry have, among many other things:

    a.    Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without board discussion or authorization;

    b.    Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without board discussion or authorization;

    c.    Marketed corporate aircraft owned by the Berry Entities for resale without board discussion or authorization;

    d.    Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals who were material to that division's structure and revenue development.

## VII.    DAMAGES

114.    Plaintiff alleges Defendants' scheme to defraud damaged Plaintiff by reducing the value of Plaintiff's ownership interests in the Berry Entities, including by diverting, transferring, or impairing valuable assets of the Berry Entities to Defendants or entities' controlled by

Defendants. Among other damages caused to Plaintiff and Nominal Plaintiffs by Defendants' scheme, the Defendants caused: total interest and fees paid to Marty Berry and Dennis Berry pursuant to the Insider Loans, which on information and belief exceed $5 million; any amounts paid to Western Gulf pursuant to the Rental Agreement or any other agreements; the diminution of Lawrence Berry's interest in the Berry Entities through the issuance of preferred shares and other acts to dilute his ownership share of the Berry Entities; any increase in interest rates, fees, additional covenants, the impairment of assets, and other burden placed on the Berry Entities by the Loan Agreements, Rental Agreements, and other actions detailed above, which reduce the value of Plaintiff and Nominal Plaintiffs interests; and any professional fees paid by the Berry Entities for the benefit of Defendants, including any fees, retainers, bonus, and other amounts paid to Connolly and CSMB and any patents to attorneys, accountants, or other professionals for representation of Defendants in the State Court Litigation.

115.    In addition, Defendants' attempts to prevent Plaintiff from discovering and stopping required that Plaintiff incur substantial attorney's fees and other expenses in this litigation and others. Plaintiff therefore seeks damages in an amount to be determined at trial.

116.    Defendants' conduct, as detailed above, was the direct and proximate cause of Plaintiff's injuries.

117.    In addition, and to the extent allowed under law, Plaintiff seeks to recover from Plaintiff its reasonable and necessary attorney's fees incurred in the prosecution of this lawsuit and the State Court Litigation.

118.    In addition, Defendants' actions involved fraud and malice, as detailed above. Plaintiff therefore seeks the maximum amount in exemplary damages available under Texas law.

119.    Any recovery of the above-referenced damages can be allocated between Plaintiff and Nominal Plaintiffs as appropriate.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c), Conducting the Affairs of an Enterprise Through a Pattern of Racketeering Activity
### (Plaintiff against all Defendants)

120.    Plaintiff repeats and realleges each the allegations above as if fully set forth herein.

121.    At all relevant times, Plaintiff was a person within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1961(4).

122.    At all relevant times, each of the Defendants was a person within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1961(4).

123.    At all relevant times, Defendants formed an association-in-fact for the purposes of defrauding Plaintiff and diminishing the value of his interests in the Berry Entities, among other purposes. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

124.    At all relevant times, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

125.    Specifically, at all relevant times, Defendants engaged in a "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1), by engaging in the acts alleged above. The alleged acts involved and constituted a violation of the statutes prohibiting mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). Each Defendant committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

126.    These acts of racketeering activity constitute a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, a common victim (Plaintiff), a common method of commission,

and the common purpose and common result of defrauding Plaintiff, diminishing the value of Plaintiff's interests in the Berry Entities, and enriching Defendants at the expense of the Berry Entities and Plaintiff, all while concealing Defendants' fraudulent activities. The fraudulent scheme continued for over three years and remains ongoing.

127.    As a result of Defendants violation of RICO, 18 U.S.C. § 1962(c), Plaintiff has sustained the previously alleged injuries.

128.    As a result of this misconduct, Defendants are liable to Plaintiff for its losses in an amount to be determined at trial.

129.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three times the amount of its actual damages plus costs and attorney's fees from Defendants.

130.    In addition, Plaintiff is entitled to preliminary and permanent injunctive relief to stop Defendants' ongoing scheme to defraud and prevent further injury to Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d), RICO Conspiracy**
**(Plaintiff against all Defendants)**

131.    Plaintiff repeats and realleges each the allegations above as if fully set forth herein.

132.    At all relevant times, Defendants were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. § 1962(d).

133.     Each of the Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

134.    As a result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiff has sustained the previously alleged in losses from the fraudulent scheme.

135.    As a result of the conspiracy, Defendants are liable to Plaintiff for its losses in an amount to be determined at trial.

136.    Pursuant to RICO, 18 U.S.C. § 1964(d), Plaintiff is entitled to recover threefold its damages plus costs and attorneys' fees from Defendants.

137.    Plaintiff is further entitled to preliminary and permanent injunctive relief to stop Defendants' ongoing scheme to defraud and prevent further injury to Plaintiff

**THIRD CLAIM FOR RELIEF**
**Fraud by Nondisclosure (28 U.S.C. § 1367)**
**(Plaintiff against Defendants Marty Berry and Bonnie Berry)**

138.    Plaintiff repeats and realleges each the allegations above as if fully set forth herein.

139.    Defendants Marty Berry, Bonnie Berry, and Hummell concealed and/or failed to disclose certain material facts to Plaintiff, including, without limitation, the Insider Loans, the terms of the Loan Agreement, the Rental Agreement, the Performance Deed, and other efforts by Defendants to divert assets of the Berry Entities to Defendants, as detailed above.

140.    Marty Berry, Bonnie Berry, and Hummell had duties to disclose these facts to Plaintiff.  Marty Berry, Bonnie Berry, and Hummell also knew that Plaintiff was ignorant of these facts and did not have an equal opportunity to discover them. Moreover, Marty Berry, Bonnie Berry, and Hummell were deliberately silent about these material facts when they had a duty to speak.  By failing to disclose these facts, Marty Berry, Dennis Berry, Bonnie Berry, and Hummell intended to induce Plaintiffs to take some action or refrain from acting, including without limitation, objecting and/or taking other actions to stop and/or limit these transactions from taking place. Plaintiff relied on Marty Berry's, Bonnie Berry's, and Hummell's nondisclosures, including by failing to take actions to limit, object to, or otherwise stop the above-referenced actions from taking place.  Plaintiffs suffered injuries as a result of acting without the undisclosed facts, including without limitation, injuries to the Berry Entities as well as to Lawrence Berry

individually,

141.    As a result, Plaintiffs seek actual damages, exemplary damages, and equitable remedies.

### FOURTH CLAIM FOR RELIEF
### Conspiracy to Commit Fraud by Nondisclosure
### (Plaintiff against Defendants Marty Berry and Bonnie Berry)

142.    Plaintiff repeats and realleges each the allegations above as if fully set forth herein.

143.    Defendants conspired to commit fraud by nondisclosure regarding, without limitation, the Insider Loans, the terms of the Loan Agreement, the Rental Agreement, the Performance Deed, and other efforts by Defendants to divert assets of the Berry Entities to Defendants, as detailed above. Defendants had a meeting of the minds regarding these actions, evidenced by, among other things, their participation in the same.

144.    In particular, and without limitation, by virtue of their engagement by the Berry Entities and knowledge of confidential and sensitive records belonging to the Berry Entities, including, among other things, financials, organizational charts, and ownership structure, CSMB and Connolly knew that Marty Berry, Dennis Berry, Bonnie Berry, and Hummell owed duties to disclose material information to Plaintiffs and did not disclose them. Because Western Gulf is owned by Marty Berry, it also has actual knowledge that Marty Berry owes duties to disclose to Plaintiffs.

145.    In particular, and without limitation, CSMB and Connolly have played a knowing and active role in the Loan Agreements, including taking the lead in negotiating and communicating internally and with third parties regarding the same to the detriment of Plaintiff and done without making key disclosures to Plaintiff, as outlined above and incorporated herein. Moreover, Connolly made false representations to the Court to further the fraud.

146.    Defendants' agreement to commit fraud by nondisclosure proximately caused

Plaintiff's damages.

147.    Therefore, Defendants are jointly and severally liable for Plaintiffs' damages resulting from their acts and conduct.

## FIFTH CLAIM FOR RELIEF
### Participating In and Aiding and Abetting Fraud by Nondisclosure
### (Plaintiff against Defendants Marty Berry and Bonnie Berry)

148.    Plaintiff repeats and realleges each the allegations above as if fully set forth herein.

149.    Defendants committed fraud by nondisclosure in connection with, without limitation, the Insider Loans, the terms of the Loan Agreement, the Rental Agreement, the Performance Deed, and other efforts by Defendants to divert assets of the Berry Entities to Defendants, as detailed above. Defendants had the intent to assist each other in committing fraud by nondisclosure. Defendants gave each other assistance or encouragement in committing fraud by nondisclosure. Defendants' assistance or encouragement was a substantial factor in causing the fraud by nondisclosure.

150.    In particular, and without limitation, CSMB and Connolly have played a knowing and active role in negotiating the Loan Agreements, including by communicating internally and with third parties regarding the Loan Agreements to the detriment of Plaintiff and without making key disclosures to Plaintiff, as alleged above. Connolly also testified in open court that the Loan Agreement had been completed when it had not. Connolly thus made false representations to the Court to further the fraud.

151.    Plaintiff has suffered injuries as a result of Defendant's actions. Therefore, Defendants are jointly and severally liable for Plaintiff's damages resulting from their acts and conduct.

## SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Plaintiff and Nominal Plaintiffs Against Marty Berry and Bonnie Berry)

152.    Plaintiffs repeat and reallege each the allegations above as if fully set forth herein.

153.    Marty Berry, Dennis Berry, Bonnie Berry, and Hummell are officers and/or directors of the Berry Entities.  As officers and directors, they owe fiduciary duties to the Berry Entities. *See Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963).

154.    Fiduciaries owe several duties—which among them, include: (a) loyalty and utmost good faith, *see Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942); (b) candor, *see Wolf v. Ramirez*, 622 S.W.3d 126, 142 (Tex. App.—El Paso 2020, no pet.); (c) refraining from self-dealing—which extends to dealings with a fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with the fiduciary, *see Dearing Inc. v. Spiller*, 824 S.W.2d 728, 733 (Tex. App.—Fort Worth 1992, writ denied); (d) acting with integrity of the strictest kind, *Armstrong v. Armstrong*, 507 S.W.3d 783, 790 (Tex. App.—El Paso 2018, pet. denied); (e) fair and honest dealing, *Kinzbach*, 160 S.W.2d at 512; and (f) full disclosure, regardless of whether a lawsuit is pending against the fiduciary.  *Valdez v. Hollenbeck*, 465 S.W.3d 217, 230 (Tex. 2015); *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996).

155.    Corporate officers and directors owe additional and specific fiduciary duties, including: (a) duty not to usurp corporate opportunities for personal gain, *see Int'l Bankers*, 368 S.W.2d at 577; (b) duty of good faith in relations with the corporation, *see Imperial Grp. (Tex.), Inc. v. Scholnick*, 709 S.W2d 358, 363 (Tex. App.—Tyler 1986, writ ref'd n.r.e.); (c) duty of full disclosure of any personal interest the officer or director has in the subject matter of the contract the officer or director negotiates with the corporation in which he or she has a personal interest, *see Gen. Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied); (d) loyalty, *see id.*; (e) duty to use uncorrupted business judgment for the sole benefit of the

corporation, *see Int'l Bankers*, 368 S.W.2d at 577; (f) duty of due care, *see In re Estate of Poe*, 648 S.W.3d 277, 287 (Tex. 2022); and (g) duty of obedience, *see id.*

156.    As outlined above and incorporated herein, in connection with the Insider Loans, the Loan Agreement, the Rental Agreement, the Performance Deed, and other efforts by Defendants to divert assets of the Berry Entities to Defendants, Marty Berry's, Dennis Berry's, and Bonnie Berry's and Hummel's actions, individually and collectively, outlined above have violated a number of fiduciary duties that have caused damages and/or resulted in an improper benefit, including without limitation:

     a.  Duties of loyalty, candor, and utmost good-faith;

     b.  Duty to use uncorrupted business judgment for the sole benefit of the Berry Entities;

     c.  Duty to act with integrity of the strictest kind;

     d.  Duty of fair and honest dealing;

     e.  Duty to refrain from self-dealing;

     f.  Duty of full disclosure;

     g.  Duty of due care;

     h.  Duty of obedience;

     i.  Duty not to usurp corporate opportunities for personal gain; and

     j.  Duty of good faith relations with the Berry Entities.

157.    These breaches, separately and collectively, have caused damages, including without limitation, to Plaintiffs, and have further resulted in improper benefits to Marty Berry, Dennis Berry, Bonnie Berry, and/or Hummell.

158.    Plaintiff, directly and on behalf of the Nominal Plaintiffs, therefore seek actual damages, exemplary damages, and equitable remedies.

### SEVENTH CLAIM FOR RELIEF
#### Conspiracy to Breach of Fiduciary Duty
#### (Plaintiff and Nominal Plaintiffs against Marty Berry and Bonnie Berry)

159.    Plaintiffs repeat and reallege each the allegations above as if fully set forth herein.

160.    Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, and Connolly conspired to breach fiduciary duties owed to Plaintiffs by Marty Berry, Dennis Berry, Bonnie Berry, and Hummell.

161.    In particular, and without limitation, by virtue of their engagement by the Berry Entities and knowledge of confidential and sensitive records belonging to the Berry Entities, including, among other things, financials, organizational charts, and ownership structure, CSMB and Connolly knew that Marty Berry, Dennis Berry, Bonnie Berry, and Hummell owed fiduciary duties to Plaintiffs.  Because Western Gulf is owned by Marty Berry, it also has actual knowledge that Marty Berry owes fiduciary duties to Plaintiffs.

162.    Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, Connolly, and Western Gulf had a meeting of the minds regarding these actions, evidenced by, among other things, their participation in the same.  In particular, and without limitation, CSMB and Connolly have played an active role in the Loan Agreements, including taking the lead in negotiating and communicating internally and with third-parties regarding the same to the detriment of Plaintiffs and in breach of fiduciary duties.  Moreover, Connolly made false representations to the Court to further the fiduciary breaches. Marty Berry's, Dennis Berry's, Bonnie Berry's, Hummell's, CSMB's, Connolly's, and Western Gulf's agreement to commit breaches of fiduciary duties, as outlined above and incorporated herein, proximately caused Plaintiffs' damages.

163.    Therefore, Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, Connolly, and Western Gulf are jointly and severally liable for Plaintiffs' damages resulting from their acts and conduct.

## EIGHTH CLAIM FOR RELIEF
### Knowing Participation in Breach of Fiduciary Duty/Joint Tortfeasor Liability
### (Plaintiff and Nominal Plaintiffs against Marty Berry and Bonnie Berry)

164.    Plaintiffs repeat and reallege each the allegations above as if fully set forth herein.

165.    As outlined above, Marty Berry, Dennis Berry, Bonnie Berry, and Hummell breached fiduciary duties to Plaintiffs.  At the time of these breaches, Marty Berry, Dennis Berry, Bonnie Berry, and Hummell had knowledge their conduct was tortious.

166.    Nevertheless, Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, Connolly, and Western Gulf knew of Marty Berry's, Dennis Berry's, Bonnie Berry's, and Hummell's fiduciary relationships and knowingly participated in the breaches of fiduciary duty.

167.    In particular, by virtue of their engagement by the Berry Entities and knowledge of confidential and sensitive records belonging to the Berry Entities, including, among other things, financials, organizational charts, and ownership structure, CSMB and Connolly knew that Marty Berry, Dennis Berry, Bonnie Berry, and Hummell owed fiduciary duties to Plaintiffs.  Because Western Gulf is owned by Marty Berry, it also has actual knowledge that Marty Berry owes fiduciary duties to Plaintiffs.

168.    In particular, and without limitation, CSMB and Connolly have played a knowing and active role in the Loan Agreements, including taking the lead in negotiating and communicating internally and with third-parties regarding the same to the detriment of Plaintiffs and in breach of fiduciary duties, as outlined above and incorporated herein. Connolly also testified in an open court that the Refinancing had been completed when it had not.

169.    Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, Connolly, Western Gulf were aware they were participating in the breach of fiduciary relationships by virtue of their knowledge and knowing participation in the same, as outlined above and incorporated herein.

170.    Moreover, Connolly made false representations to the Court to further the fiduciary breaches.

171.    Marty Berry's, Dennis Berry's, Bonnie Berry's, Hummell's, CSMB's, Connolly's, and Western Gulf's assistance and participation were substantial factors in causing the breaches of fiduciary duty.

172.    As a result, Marty Berry, Dennis Berry, Bonnie Berry, Hummell, CSMB, Connolly, and Western Gulf are jointly and severally liable for Plaintiffs' damages resulting from their acts and conduct.

## NINTH CLAIM FOR RELIEF
### Demand for Books and Records

173.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

174.    At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP through his interests in LDMA and Becon.

175.    Beginning on or around April of 2023, Lawrence Berry sent a good faith written demand to Defendants for books and records related to Berry GP and its subsidiaries, including without limitation the other Berry Entities. However, this request was ignored, and Lawrence Berry never received a response.

176.    In the months that followed, Lawrence Berry sent written requests seeking financial information and records about the Berry Entities, including information about the Illegitimate Loans. This correspondence was directed to officers and directors at the Berry Entities, including CFO Jim Klein, Marty Berry, and Dennis Berry. Although Lawrence Berry was entitled to this information, Defendants failed to respond.

177.    As a shareholder of Berry GP for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP,

Lawrence Berry is entitled to examine and copy Berry GP's books, records of account, minutes, and share transfer records.  Tex. Bus. Orgs. Code § 21.218.

178.    The Bylaws of Berry GP do not alter or limit Lawrence Berry's right to inspect Berry GP, Inc.'s books and records.  Indeed, Section XXIV states that "the books, accounts and records of [Berry GP] shall be open to inspection by the shareholders at all reasonable times[.]"

179.    Defendants failed to respond to Lawrence Berry's lawful request, let alone provided any reason why Lawrence Berry would not be entitled to inspect the books and records of Berry GP and its subsidiaries.

180.    During the pendency of this lawsuit, Marty Berry, Bonnie Berry, and Hummell have confirmed to Lawrence Berry that they are purposefully and intentionally withholding key financial records belonging to the Berry Entities, including without limitation the 2024 Audited Financial Statements.

181.    Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

182.    Plaintiff Lawrence Berry brings this claim directly and derivatively on behalf of LDMA, Becon, and Berry GP.

**TENTH CLAIM FOR RELIEF**
**Declaratory Judgment**

183.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

184.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, Plaintiffs seek a judicial declaration of his rights, status, and other legal relations with respect to Defendants under the Berry GP bylaws and laws of the State of Texas.

185.    First, Plaintiffs seek a judicial declaration that the purported December 7, 2023 "ratifications" of the following agenda items were ineffectual and null and void, because they were not procured with the approval of a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of the disinterested shareholders after disclosure of all material facts:

      a.    Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

      b.    Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

      c.    Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

      d.    Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale; and

      e.    Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce.

186.    Second, Plaintiffs seek a judicial declaration that the purported February 13, 2024 "ratifications" or "resolutions" were ineffectual and null and voids, because they were not approved by a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of a majority of the fully informed and disinterested shareholders:

a.     BE IT RESOLVED that all action previously taken by any Director of Berry GP, Inc. or any employee of Bay Ltd. to promote, advertise, or seek offers for the sale of the Berry Dock is hereby ratified. The Board further determines that the Berry Dock and adjacent property is to remain listed for sale and that no sale shall take place pending the resolution of the TRO currently in place in Nueces County, Texas.

b.     BE IT RESOLVED that the loans made to Berry GP Inc. by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interest of Berry GP, and are ratified.

c.     BE IT RESOLVED that the two (2) aircraft owned by Berry GP Inc. are to remain listed for sale, and are to be sold upon approval of an acceptable offer to purchase.

d.     BE IT RESOLVED that all actions taken by any director of Berry GP, Inc. or any employee of Bay Ltd. including Robert Powers and Mike Hummell, in furtherance of discontinuing the banking relations between Berry GP, Inc. and International Bank of Commerce is hereby ratified.

e.     BE IT RESOLVED that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that company to any Berry company for performing the work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

187.    Each of the "ratifications," "resolutions," and/or transactions detailed above required informed approval by a majority of the disinterested Directors or Shareholders, pursuant to Texas Business Organizations Code section 21.418.

188.    Plaintiff brings this claim individually and derivatively on behalf of LDMA, Becon, and Berry GP.

### ELEVENTH CLAIM FOR RELIEF
### Conversion
### (Plaintiff and Nominal Plaintiffs against Marty Berry and Bonnie Berry)

189.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

190.    Pursuant to Texas law, Defendants are liable to Plaintiffs for conversion. Becon, LDMA, and Berry GP have the right to possess property of the Berry Entities.

191.    By unlawfully voting to indemnify themselves and advance themselves litigation costs—over the objection of Lawrence Berry as the sole disinterested member of the board of directors for such vote—Defendants are depriving Plaintiffs of their rightful interest in the property of the Berry Entities.

192.    Lawrence Berry's objection to the vote constitutes his demand for the return of the advanced litigation fees.  Alternatively, demand was not required.

193.    As a result of Defendants' unlawful vote and improper squandering of the Berry Entities' money, LDMA, Becon and Berry GP have suffered damages within the jurisdictional limits of this Court.  Further, Plaintiffs are entitled to recover exemplary damages because Defendants acted with actual malice when converting the Berry Entities' property.

194.    Because Berry GP, Becon, and LDMA operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence Berry—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence Berry, with any recovery being paid directly to Lawrence Berry, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

195.    Alternatively, Plaintiffs bring this claim derivatively on behalf of LDMA, Becon, and Berry GP.

## TWELTH CLAIM FOR RELIEF
### Corporate Waste
**(Plaintiff and Nominal Plaintiffs against Marty Berry and Bonnie Berry)**

196.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

197.    Marty Berry's, Dennis Berry, and Bonnie Berry's use of corporate assets for personal applications constitutes corporate waste.

198.    In particular, on information and belief, Marty Berry uses assets of the Berry Entities to operate his personally owned company, Western Gulf Equipment.  Defendant Marty Berry does not provide adequate consideration to the Berry Entities in return for these uses of Berry Entity assets, and instead further encumbers the Berry Entities by charging lease payments for the Berry Entities' use of Western Gulf cranes.  There is no business justification for using the Berry Entities' corporate assets for Defendant Marty Berry's personal applications without adequate consideration.

199.    Further, Marty Berry and Dennis Berry approved payments to Marty Berry from the Berry Entities of at least $10 million in principal on his undisclosed and improper self-dealing loan, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024.  There is no business justification for using the Berry Entities' corporate assets to make such voluntary payments for Marty's personal benefit, thus depriving the Berry Entities' of vital liquidity.

200.    Finally, on information and belief, Plaintiffs allege that Marty Berry and Bonnie Berry engage in additional corporate waste by using Berry Entities' assets for personal applications without adequate consideration, including as detailed above.   However, because Plaintiffs have been denied adequate access to the Berry Entities' books and records, the scope and extent of that additional corporate waste is not yet clear.  Lawrene Berry reserves the right to add additional

claims for corporate waste after a proper accounting has been made of the Berry Entities' books and records.

201.    The Berry Entities and Lawrence Berry have been damaged by Defendant Marty Berry's waste of corporate assets.

202.    Because Berry GP, Becon, and LDMA operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence Berry—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence Berry, with any recovery being paid directly to Lawrence Berry, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

203.    Alternatively, Lawrence Berry brings this claim derivatively on behalf of LDMA, Becon, and Berry GP.

**THIRTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Plaintiff and Nominal Plaintiffs against Marty Berry and Bonnie Berry)**

204.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

205.    Marty Berry and Bonnie Berry were unjustly enriched due to his fraud and breaches of fiduciary duty regarding without limitation, the Insider Loans, the Loan Agreements, the Rental Agreement, and Performance Deed, the sale and pledging of Berry Entities' assets, and/or deprivation of Lawrence Berry's management rights.

**FOURTEENTH CLAIM FOR RELIEF**
**Violations of the Texas Uniform Fraudulent Transfer Act ("TUFTA")**
**(Plaintiff and Nominal Plaintiffs against Marty Berry and Western Gulf)**

206.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

207.    Plaintiffs bring this claim pursuant to the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"). See Tex. Bus. & Com. Code §§ 24.001 et seq.

208.     Plaintiffs are "creditors" as defined under TUFTA because they have asserted a claim to a right to payment against Marty Berry. *See id.* § 24.002(3)-(4).

209.     Marty Berry is a "debtor" under TUFTA because Plaintiffs have asserted claims against him, and he could be liable on those claims. *Id.* § 24.002(6).

210.     Upon information and belief, regarding transaction between the Berry Entities and Western Gulf, Marty Berry and Western Gulf have transferred assets that otherwise belonged to and/or should have been distributed to Marty Berry and/or incurred obligations after Plaintiffs asserted a claim against Marty Berry.

211.     Such transfers and obligations outlined above are actionable under TUFTA. Plaintiffs' claims against Marty Berry arouse before the transfers and/or obligations were made or incurred.  The transfers and obligations were made or incurred with actual intent to hinder, delay, or defraud Plaintiffs.  Marty Berry's intent is demonstrated by various badges of fraud, including, without limitation:

   a.   The transfers or obligations were made to individual and entity "insiders" as defined under TUFTA, that were owned and controlled by Marty Berry at all times;

   b.   The transfers or obligations were concealed;

   c.   Before the transfers were made or obligations were incurred, Marty Berry had been threatened with suit

   d.   Before the transfer or obligation was incurred, Marty Berry had been sued.

   e.   Before the transfer or obligation was incurred, Western Gulf had been threatened with suit.

    f.   The value of the consideration received by Marty Berry and Western Gulf was not reasonably equivalent to the value of the asset transferred or the amount of obligation incurred.

212.    Western Gulf is a transferee and insider within the meaning of TUFTA and is owned and controlled by Marty Berry. The transfers were made to Western Gulf for their benefit and/or each was the first transferee of the assets and did not receive these transfers in good faith and/or for a reasonable equivalent value. *See* TEX. BUS. & COM. CODE § 24.009(b). Therefore, Plaintiffs are entitled to a judgment against Marty Berry and Western Gulf for violations of TUFTA.

213.    Pursuant to Texas Business and Commerce Code Section 24.008, Plaintiffs further seek, among other relief:

    a.   Avoidance of transfers in violation of TUFTA;

    b.   An attachment or other provisional remedy against the assets of transferee Western Gulf;

    c.   Subject to the applicable principles of equity and in accordance with the Texas Rules of Civil Procedure: (i) an injunction against further disposition by Marty Berry and Western Gulf of the transferred assets, or of other property belonging to Marty Berry; (ii) appointment of a receiver to take charge of Marty Berry and Western Gulf's assets; or (iii) any other relief the circumstances may require; and/or judgment for the value of the asset transferred, or the amount necessary to satisfy Plaintiffs' claim, whichever is less. *See* TEX. BUS. & COM. CODE §§ 24.008, 24.009.

214.    Separately and independently, Marty Berry's and Western Gulf's violations of TUFTA, as outlined above, further constitute fraud and entitle Plaintiffs to exemplary damages

against each under Chapter 41 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 41.003(a)(1).

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants as follows:

a.    Award Plaintiff such equitable injunctive and ancillary relief as may be necessary to avert the likelihood of Plaintiff's irreparable injury or prohibit the illicit conduct described herein during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to a temporary restraining order and a preliminary injunction.

b.    Declaratory and injunctive relief to prevent and restrain further RICO violations, including a permanent injunction, rescission, and/or unwinding of unlawful transactions and enjoining further disposition of key assets;

c.    A permanent injunction or other equitable relief to prevent Defendants from violating 18 U.S.C. 1964 in the future.

d.    Award Plaintiff treble damages under 18 U.S.C. § 1964(c), in an amount to be proven at trial;

e.    Award Plaintiff costs of suit and reasonable attorneys' fees under 18 U.S.C. § 1964(c);

f.    Pre- and post-judgment interest as allowed by law;

g.    Restitution, disgorgement, constructive trust, and other equitable relief as appropriate; and

h. Such other and further relief as the Court deems just and proper.

## X.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated March 5, 2026.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By:    <u>/s/ Joshua J. Caldwell</u>
Santos Vargas – *Lead Attorney*
State Bar No. 00000145
E-mail: svargas@dslawpc.com
Jay Hulings
State Bar No. 24104573
Email: jhulings@dslawpc.com
Joshua J. Caldwell
State Bar No. 24073988
Email: jcaldwell@dslawpc.com
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

-and-

**KEITH AND LORFING, PLLC**

By:    <u>/s/ Russell H. Lorfing</u>
Russell H. Lorfing
State Bar Texas 24070173
Email: russell@lorfinglaw.com
265 S. Leggett Drive
Abilene, Texas 79605
Tel.: (325) 480-8100
Fax: (325) 480-8117

***Attorneys for Plaintiff Lawrence Berry, individually and as Trustee of the Allen Lawrence Berry Trust, directly and derivatively on behalf of Becon, Inc., LDMA Limited Partnership, and Berry GP, Inc.***